IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

TIMOTHY CUMPSTON,

       Plaintiff,

v.                                CIVIL ACTION NO. 1:17CV61
                                         (Judge Keeley)

CENTRAL SUPPLY COMPANY OF WEST
VIRGINIA and PATRICK SCOTT TUCKER,

       Defendants.

MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)

The plaintiff, Timothy Cumpston ("Cumpston"), was terminated from his employment at the defendant, Central Supply Company of West Virginia ("Central Supply"), one day after requesting six to eight weeks of medical leave to recover from a necessary surgery. Cumpston alleges that Central Supply and the defendant, Patrick Scott Tucker ("Tucker") (collectively, "the defendants"), violated the Family and Medical Leave Act by terminating him. He further alleges that the defendants discriminated and retaliated against him because of his need for surgery and time to recover. He also alleges that the defendants denied him wages for paid time off he had accumulated, acted in an outrageous manner, and retaliated against him for applying for short-term disability benefits.

Pending is the defendants' motion for summary judgment (Dkt. No. 80) and Cumpston's motion to dismiss count six (Dkt. No. 79). For the reasons that follow, the Court **GRANTS** the motions and

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

**DISMISSES** the Complaint **WITH PREJUDICE**.

## I. BACKGROUND

### A.    The Facts

As it must, the Court recites the facts in the light most
favorable to the non-moving party. See Providence Square Assocs.,
L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000).

### 1.    Cumpston's Employment History with Central Supply

In 1982, Cumpston began working for Central Supply, which
produces and supplies "ready mix" concrete and other building
materials throughout the state of West Virginia (Dkt. No. 80-3 at
13-14). Cumpston left Central Supply in 1989, but returned in 1994
and worked as a "boom truck" driver in Central Supply's building
supply division until his termination on August 19, 2016 (Dkt. Nos.
82 at 1, 82-1). As a boom truck driver, Cumpston was responsible
for loading, securing, and delivering orders of block, stone,
brick, masonry, gravel, or other building supplies to both
commercial and residential customers (Dkt. No. 80-3 at 19-20).
During that time, Tucker, who was the Operations Manager for
Central Supply's building supply division, served as Cumpston's
direct supervisor. Id. at 2. Tucker in turn reported directly to
Dwayne McCartney ("McCartney"), the President of Central Supply

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

(Dkt. Nos. 81 at 2, 82-6 at 3).

After returning to Central Supply in 1994, Cumpston was involved in seven safety-related incidents as a boom truck driver, all of which occurred after 2006 (Dkt. Nos. 80-4, 80-5, 80-6, 80-7, 80-8, 80-9, 80-10). Although some of these incidents were preventable or resulted in significant damage to company property, the only punishment Cumpston ever received was a one-day suspension without pay (Dkt. No. 80-6).

During his employment, Cumpston struggled with Crohn's disease. When Cumpston advised Central Supply of his struggle, it conditionally granted him intermittent leave under the FMLA, allowing him to take FMLA leave without having a doctor pre-certify the leave's medical necessity (Dkt. Nos. 80-1 at 16-17, 82-4). This intermittent leave allowed Cumpston to take time off work when he was suffering from "flare ups" (Dkt. No. 80-1 at 17-18). For the next two years, Cumpston continued to work for Central Supply without repercussion (Dkt. No. 80-1 at 16-18).

**2.  Cumpston's 2016 Request for FMLA Leave**

On August 18, 2016, Cumpston was diagnosed with diverticulitis and told he needed to have surgery on September 7, 2016, to treat it (Dkt. Nos. 80-1 at 19-20, 80-14). He also learned that he would

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

need six to eight weeks off work to recover from the surgery (Dkt.
No. 80-14). Cumpston immediately informed Tucker about his need for
surgery and medical leave (Dkt. No. 80-1 at 19-20).

### 3.  Central Supply's Reduction in Force and Cumpston's Termination

Tucker relayed this information via email to Central Supply's
human resources manager, Beth Nuzum ("Nuzum") (Dkt. No. 80-14).
Upon receiving Tucker's email, Nuzum immediately recognized that
Cumpston was among those employees slated to be terminated by
Central Supply in a reduction in force ("RIF") scheduled to be
announced the next day, August 19, 2016 (Dkt. No. 80-14). After
confirming with Heather Harper, Deputy General Counsel of
Oldcastle, Inc. (Central Supply's parent company), that the planned
RIF was well documented, Nuzum terminated Cumpston, offering him a
severance package, which included $3,740.00 and 4 months of COBRA
health insurance coverage (Dkt. Nos. 80-1 at 31-32, 80-13 at 3, 80-
14).

It is undisputed that Central Supply had drafted his severance
agreement and had it ready to deliver no later than August 16,
2016—two days before Tucker and Nuzum learned of Cumpston's need
for surgery (Dkt. No. 80-13). The RIF had been long in the making.

4

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

In early 2016, McCartney, Central Supply's President, had realized that a RIF might be necessary if Central Supply's building supply division continued to experience a decline in business (Dkt. No. 80-3 at 6-8, 25-26). Discussions about a RIF continued throughout 2016, until on August 11th, McCartney made the decision to proceed with the RIF during a conference call with Harper and Nuzum. Id. at 6-8, 9-10. By then, Central Supply had already determined which employees would be terminated should there be a RIF. Id. at 10-11, 25. These employees were selected following a comprehensive review of all employees working in the building supply division. Id. at 4-5. In all, Central Supply terminated three employees: a boom truck driver (Cumpston), a fork lift operator, and an administrative assistant (Dkt. Nos. 80-3 at 6, 80-13). Although Cumpston had more experience than the other boom truck drivers, according to Central Supply, he was selected for termination because he had been involved in more safety-related incidents than the other drivers (Dkt. Nos. 80-3 at 12, 80-4, 80-5, 80-6, 80-7, 80-8, 80-9, 80-10).

**B. Procedural History**

In March 2017, Cumpston sued the defendants in the Circuit Court of Harrison County, West Virginia (Dkt. No. 1-1 ), alleging (1) violation of the Family and Medical Leave Act, 29 U.S.C. §§

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND**
**GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

2601, et seq. ("FMLA"), (2) disability discrimination in violation

of the West Virginia Human Rights Act, W. Va. Code §§ 5-11B-1, et

seq. ("WVHRA"), (3) retaliatory discharge, (4) violation of the

West Virginia Wage Payment and Collection Act ("WVWPCA"), (5) tort

of outrage, and (6) short term disability insurance retaliation.

Id. at 6-8. In April 2017, the defendants removed the case to this

Court (Dkt. No. 1). It has been scheduled for trial beginning on

October 15, 2018 (Dkt. No. 11).

## II. STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling

on a motion for summary judgment, the Court reviews all the

evidence "in the light most favorable" to the nonmoving party.

Providence Square, 211 F.3d at 850. The Court must avoid weighing

the evidence or determining its truth and limit its inquiry solely

to a determination of whether genuine issues of triable fact exist.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the

6

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has made the necessary showing, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. <u>Id.</u> at 248–52.

## III. DISCUSSION

### A. FMLA Retaliation Claim

In Count One of the complaint, Cumpston alleges that the defendants violated the FMLA when they unlawfully retaliated against him by terminating his employment four days after being notified of his need for surgery and corresponding medical leave (Dkt. No. 1–1 at 6).[1]

---

[1]

  Although Cumpston's response opposing summary judgment suggests that he is pursuing claims of both FMLA interference and FMLA retaliation, Count One of his Complaint (which reads "Violation of FMLA") only alleges a claim of FMLA retaliation. But even if it were construed to allege a claim of FMLA interference, that claim would fail for the same reasons that Cumpston's retaliation claim fails.

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

Under 29 U.S.C. § 2615(a)(2), employers may not retaliate against employees for exercising rights under the FMLA. See Dotson v. Pfizer, Inc., 558 F.3d 284, 295 (4th Cir. 2009). Such claims are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Cumpston, therefore, must first establish a prima facie case of FMLA retaliation by proving three elements: (1) that he "engaged in protected activity"; (2) that he suffered "an adverse employment action"; and (3) that "there was a causal link between the protected activity and the adverse employment action." Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004). Once he establishes a prima facie case, and if the defendants "offer[] a non-retaliatory reason of the adverse action," Cumpston "'bears the burden of establishing that the [Defendants'] proffered explanation is pretext for FMLA retaliation.'" Vannoy v. Fed. Reserve Bank of Richmond, 827 F.3d 296, 304 (4th Cir. 2016)(quoting Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 551 (4th Cir. 2006)). Accordingly, to survive summary judgment, Cumpston "'must produce sufficient evidence to create a genuine dispute of material fact such that a reasonable factfinder could conclude the adverse employment action was taken for an impermissible reason, i.e.,

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

retaliation.'" <u>Waaq v. Sotera Def. Sols., Inc.</u>, 857 F.3d 179, 192 (4th Cir. 2017) (quoting <u>Sharif v. United Airlines, Inc.</u>, 841 F.3d 199, 203 (4th Cir. 2016)).

The defendants argue that Cumpston has not established a prima facie case of retaliation because he can only establish the second of the three prongs——that he suffered an adverse employment action (Dkt. No. 81 at 9). They contend Cumpston was not engaged in a protected activity when terminated, nor can he show any causal connection between his protected activity and his termination. <u>Id.</u>

This argument is based on a fundamental misunderstanding of the meaning of "prima facie," which is defined as "[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted; based on what seems to be true on first examination, even though it ma[y] later be proved to be untrue." *Prima facie*, <u>Black's Law Dictionary</u> (10th ed. 2014). Here, Cumpston notified the defendants of his need for surgery and corresponding medical leave on Thursday, August 18, 2016 (Dkt. No. 80-1 at 19-20). On Monday, August 22, 2016, he met with a representative from Human Resources, and was terminated, effective Friday, August 19, 2016 (Dkt. Nos. 80-1 at 31-33, 80-13 at 3). These facts establish a prima facie case of FMLA retaliation. First, Cumpston engaged in protected

MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)

activity when he notified Central Supply of his need for surgery
and corresponding medical leave, see Krenzke v. Alexandria Motor
Cars, Inc., 289 F. App'x 629, 632 (4th Cir. 2008); second, he
suffered an adverse employment action, see Dowe v. Total Action
Against Poverty in Roanoke Valley, 145 F.3d 653, 656 (4th Cir.
1998), abrogated on other grounds by Burlington N. & Sante Fe Ry.
v. White, 548 U.S. 53, 68 (2006); and third, the temporal proximity
between his request for FMLA leave and his termination suggests a
causal link between the two, see Waag, 857 F.3d at 192.

Although the defendants point to evidence tending to disprove
Cumpston's prima facie case (Dkt. No. 81 at 10-13), rebuttal
evidence does not preclude Cumpston from establishing a prima facie
case at the outset. Indeed, if it did, there would be no need for
the McDonnell Douglas burden-shifting framework. In short, Cumpston
has established a prima facie case of FMLA retaliation.

Once a plaintiff establishes a prima facie case, the burden
shifts to the defendant to "offer[] a non-retaliatory reason of the
adverse action . . . ." Vannoy, 827 F.3d at 304 (citation omitted).
The defendants insist that, instead of retaliating against him,
they terminated Cumpston in an economically-required RIF, which
Central Supply had decided to execute long before it knew of

10

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

Cumpston's need for FMLA leave (Dkt. No. 81 at 13-16). They contend that he was specifically selected for inclusion in the RIF because he was the boom truck driver with the most safety-related incidents. Id. at 14.

This explanation is confirmed by the undisputed evidence. In his deposition, Cumpston concedes that the defendants did not know about his need for surgery and corresponding medical leave until August 18, 2016, the day he notified Tucker (Dkt. No. 80-1 at 19-20). Central Supply, however, had decided to include Cumpston in its RIF by August 11, 2016—at least seven days before Cumpston requested FMLA leave (Dkt. No. 80-3 at 9-11). Indeed, the severance agreements for each employee included in the RIF had been completed and were ready for distribution by August 16, 2016, two days before Cumpston requested FMLA leave (Dkt. No. 80-13). Additionally, there is no dispute that Cumpston was the boom truck driver with the most safety-related incidents (Dkt. Nos. 80-3 at 12, 80-4, 80-5, 80-6, 80-7, 80-8, 80-9, 80-10).

Because the defendants have satisfied their burden of offering a non-retaliatory reason for the adverse employment action, Cumpston must show that Central Supply's reason for terminating him is "pretext for FMLA retaliation." Vannoy, 827 F.3d at 304

11

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND**
**GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

(citation omitted). To do so, he must offer evidence that tends to show that the defendants' explanation is not credible, or that retaliation is the most likely explanation. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

Based on the facts alleged in Cumpston's Complaint, it is factually impossible for the RIF to serve as pretext for FMLA retaliation when he was selected for termination on August 11, 2016, when no one (including Cumpston) knew about his need for surgery and time off work until August 18, 2016. Recognizing this problem, Cumpston argues that the defendants retaliated against him because they knew of his struggle with Crohn's disease and that he may need extended time off in the future (Dkt. No. 82 at 4-11). In addition, he argues that Central Supply's RIF was not economically required and, therefore, not credible. Both arguments are unavailing.

First, there is no evidence from which a reasonable factfinder could draw the inference that the defendants knew Cumpston "may have needed extended time off prior to" terminating his employment (Dkt. No. 82 at 6). Although Cumpston took FMLA leave in 2014 because of his struggle with Crohn's disease, it is undisputed that he took that leave without any repercussion for two years (Dkt. No.

80-1 at 16-18). This lapse in time negates any inference of pretext. Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 251 (4th Cir. 2015) ("[T]he causation standards for establishing a prima facie retaliation case and proving pretext are not identical. Rather, the burden for establishing causation at the prima facie stage is 'less onerous.'"); Dowe, 145 F.3d at 657 ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action, . . . negates any inference that a causal connection exists between the two."). And a history of approving past requests for FMLA leave "is not the record of a company that is historically hostile to FMLA leave in any discernable way." Sharif, 841 F.3d at 205.

Second, there is no evidence in the record to suggest that the defendants knew that Cumpston had missed work in late July and early August of 2016 for a colonoscopy and x-ray. Indeed, he only submitted one "Return to Work Slip" that accounts for that period of time, which states only that he missed work for an "appointment" on July 25, 2016, and could return to work the following day (Dkt. No. 82-2 at 12). A routine doctor's note does not put an employer on notice that its employee was having a certain procedure done, or that he would need extended time off. See, e.g., Reeder v. Cty. of

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

Wayne, 177 F. Supp. 3d 1059, 1071-72 (E.D. Mich. 2016) ("'[A]
doctor's note that fails to state with specificity the condition
behind the prescribed leave or the treatment to be administered .
. . is insufficient on its own to provide notice to an employer of
the employee's request for FMLA leave.'" (quoting Festerman v. Cty.
of Wayne, 611 F. App'x 310, 315 (6th Cir. 2015))). Moreover, even
had the defendants known that Cumpston was scheduled to undergo a
colonoscopy and x-ray, it is unreasonable to suggest that those
procedures, alone, would forecast the need for surgery and an
extended period of time off work.

Third, Central Supply's size does not preclude it from
economic reality. If the economy or a section of the economy
suffers an economic downturn, companies both large and small suffer
its effects. Here, McCartney testified that Central Supply's
building supply division was suffering an ongoing decline in
business because of market conditions and changes in the
construction industry (Dkt. No. 80-3 at 6, 17-18). Before,
buildings were constructed with masonry block and backed up by
brick. Id. at 18. Now, buildings are constructed with insulated
concrete forms or metal studs, insulation, and brick. Id. He also
testified that because the construction industry lacks qualified

14

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

masons to do the work, "specifiers" have turned to other building specifications. Id. All of these factors led to a decrease in orders in Central Supply's building supply division. Id. McCartney had monitored the building supply division's performance throughout 2016, and when its performance did not improve that summer, he determined that Central Supply would have to proceed with the RIF. Id. at 6-8, 25-26. According to McCartney, Cumpston's position was eliminated based on the building supply line's actual needs. Id. at 23-24. Central Supply had no legal obligation to transfer him to its ready mix division, and Cumpston had not applied for any open positions in that division.

Fourth, there is no evidence that Central Supply's explanation that it decided to RIF Cumpston based on his driving record is not credible. McCartney testified that Central Supply's comprehensive review of personnel files included an emphasis on safety (Dkt. Nos. 80-3 at 4-5). It is undisputed that the boom truck drivers retained had fewer safety-related accidents than Cumpston (Dkt. Nos. 80-3 at 12). Nor is there any evidence to suggest that boom truck drivers with similar driving records were not terminated. See Laing v. Fed. Exp. Corp., 703 F.3d 713, 719 (4th Cir. 2013) (noting that evidence of similarly situated employees (but for the protected

15

MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)

characteristic) receiving more favorable treatment is "especially relevant" to showing pretext under the McDonnell Douglas burden-shifting framework).

At bottom, Cumpston has failed to produce sufficient evidence to support a plausible inference that the defendants' reason for terminating his employment was pretext for FMLA retaliation, let alone show that it was the but-for cause of his termination. See Foster, 787 F.3d at 252 (holding "that the McDonnell Douglas framework has long demanded proof at the pretext stage that retaliation was a but-for cause of a challenged adverse employment action"). The Court therefore **GRANTS** the defendants' motion to dismiss Count One of the Complaint.

**B.    State Law Discrimination Claim**

In Count Two of the complaint, Cumpston contends that the defendants' decision to terminate his employment was substantially motivated by his disability in violation of the West Virginia Human Rights Act (Dkt. No. 1-1 at 4).

The West Virginia Human Rights Act ("the WVHRA"), W. Va. Code §§ 5-11-1, et seq., prohibits employers from discriminating against any individual with respect to "compensation, hire, tenure, terms, conditions or privileges of employment." W. Va. Code § 5-11-9(C).

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

Discrimination "means to exclude from, or fail or refuse to extend to, a person equal opportunities because of . . . disability . . . ." W. Va. Code § 5-11-3(h). The Act defines disability as

> (1) A mental or physical impairment which substantially limits one or more of such person's major life activities. The term "major life activities" includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working;
> (2) A record of such impairment; or
> (3) Being regarded as having such an impairment.

Id. at § 5-11-3(m).

Discrimination claims brought under the WVHRA are governed by the burden-shifting framework of Title VII of the Civil Rights Act of 1964, as set forth in McDonnell Douglas. See Shepherdstown Volunteer Fire Dep't v. State ex rel. State of W. Va. Human Rights Comm'n, 309 S.E.2d 342, 352 (W. Va. 1983) (reaffirming use of the McDonnell Douglas standard in West Virginia).

In order to set forth a prima facie case of impermissible employment discrimination under the WVHRA, Cumpston must establish: (1) that he is a member of a protected class; (2) that the employer made an adverse employment decision affecting him; and (3) that, but for his protected status, the employer would not have made the

MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)

adverse decision.[2] Syl. pt. 3, <u>Conaway v. E. Associated Coal Corp.</u>,
358 S.E.2d 423, 429 (W. Va. 1986). To establish the third element
of the prima facie case, Cumpston must "show some evidence which
would sufficiently link the employer's decision and [his] status as
a member of a protected class so as to give rise to an inference
that the employment decision was based on an illegal discriminatory
criterion." <u>Id.</u> at 429-30.

Once Cumpston establishes a prima facie case under <u>Conaway</u>,
the burden shifts to the defendants to advance a non-discriminatory
reason for the his dismissal. <u>Conaway</u>, 358 S.E.2d at 430. "The
reason need not be a particularly good one. It need not be one
which the judge or jury would have acted upon. The reason can be
any other reason except that the plaintiff was a member of a
protected class." <u>Id.</u> If the defendants offer a legitimate, non-
discriminatory reason for their decision, Cumpston has the burden
of proving that the facially legitimate reason given by the
employer for the employment decision was merely a pretext for a

_____

[2]
 Here, the Court need not decide whether to apply the modified prima facie case
formulation set forth by the Fourth Circuit in <u>Corti v. Storage Tech. Corp.</u>, 304
F.3d 336, n. 6 (4th Cir. 2002) because "the complexities and difficulties of
determining what employee was replaced by whom in the typical mass layoff case
is simply not an issue here." <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 56
F.3d 542, 546 (4th Cir. 1995) (questioning applicability of RIF prima facie
formulation where the reduced "force" consisted of two people, and although the
plaintiff's position was eliminated, he was essentially replaced by another
employee), <u>rev'd on other grounds</u>, 517 U.S. 308 (1996).

18

discriminatory motive. Eddy v. Biddle, No. 1:11CV137, 2013 WL 66929, at *6 (N.D. W. Va. Jan. 4, 2013) (quoting Ford Motor Credit Co. v. W. Va. Human Rights Comm'n, 696 S.E.2d 282, 293 (W. Va. 2010)). In other words, "[t]o get to the jury, [Cumpston] must offer sufficient evidence that the [defendants'] explanation was pretextual to create an issue of fact." Skaggs v. Elk Run Coal Co., Inc., 479 S.E.2d 561, 583 (W. Va. 1996).

Here, the defendants argue that Cumpston's WVHRA claims fails as a matter of law because he has not established a prima facie case of disability discrimination (Dkt. No. 81 at 16-17). Cumpston, however, insists that the defendants were well aware of his Crohn's disease, his July 2016 colonoscopy, and his August 2016 "testing" related to his Crohn's disease, all of which tends to show that Central Supply's decision to RIF him was pretextual (Dkt. No. 82 at 12).

While Cumpston undoubtably suffered an adverse employment action, it is unclear whether his need for surgery and medical leave rendered him disabled within the meaning of the WVHRA.[3] The

---

[3] As alleged in Count Two of the Complaint, Cumpston's claim of disability discrimination is not based on his Crohn's disease, but rather on his need for surgery and corresponding medical leave. Even if his claim were based on Crohn's disease, it is still unclear whether it "substantially limits" one or more of his "major life activities" as to qualify it as a disability under the WVHRA.

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

Court need not decide this question; even if he was disabled, Cumpston's claim of disability discrimination fails because he cannot show that he would not have been terminated "but for" his disability. Indeed, all of the evidence establishes that Cumpston would have been included in Central Supply's RIF regardless of whether he needed surgery (Dkt. Nos. 80-3 at 9-11, 80-13).

Even if Cumpston could establish a prima facie case of disability discrimination under the WVHRA, his claim would still fail because it is factually impossible for the RIF to serve as pretext for disability discrimination. When he was selected for termination on August 11, 2016, no one (including Cumpston)knew about the alleged disability until August 18, 2016. See supra Section III.A.

The outcome here might have been avoided had Cumpston alleged in his Complaint that the defendants discriminated against him based on his Crohn's disease. But the Court will not allow Cumpston to amend his complaint at this late stage to avoid summary judgment, especially when those facts were available to him at the outset. Shanahan v. City of Chicago, 82 F.3d 776, 780 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."

(citation omitted)); <u>Anderson v. Consol-Pa. Coal Co.</u>, 740 F. Supp. 1126, 1130 (W.D. Pa. 1990) ("We will not allow plaintiffs to expand their theory of the case at this late date in an effort to avoid summary judgment."). And even if he had alleged different facts, the defendants' knowledge of Cumpston's Crohn's disease, alone, is not enough to establish pretext. Where, as here, Cumpston had taken medical leave because of his Crohn's disease without repercussion for at least two years (Dkt. No. 80-1 at 16-18).

In addition, none of the evidence attached to Cumpston's response brief supports his assertion that the defendants actually knew about his July 2016 colonoscopy or his August 2016 "testing" (Dkt. No. 82 at 12). Exhibit C is a collection of emails notifying the defendants that Cumpston would be missing work because he was sick or had doctors appointments (Dkt. No. 82-3). Tellingly, these are not emails from July or August of 2016. <u>Id.</u> Exhibit E is a collection of Cumpston's hand-written notes, which were not written contemporaneously with the events as they occurred (Dkt. No. 83-1 at 5-6). But even these notes do not suggest——let alone prove——that the defendants were aware of Cumpston's July 2016 colonoscopy or August 2016 testing (Dkt. No. 82-5).

In short, Cumpston's claim of disability discrimination fails

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

for lack of proof of a prima facie case. Moreover, he's failed to provide any evidence that the defendants' RIF was pretextual. Accordingly, the Court **GRANTS** the defendants' motion to dismiss Count Two of the Complaint.

## C.    State Law Retaliation Claim

In Count Three of the Complaint, Cumpston alleges a common law claim of retaliatory discharge (Dkt. No. 1-1 at 7-8). The defendants contend that this claim fails as a matter of law because it is preempted by the remedial schemes and statutory remedies set forth in the FMLA and WVHRA (Dkt. No. 81 at 17-19). They also argue that this claim should fail because Cumpston has not identified a substantial public policy that supports his claim. <u>Id.</u> at 19-21. In response, Cumpston argues that the FMLA and the WVHRA do not preempt his related state law retaliation claim, which is supported by the substantial public policies set forth in the FMLA and the WVHRA (Dkt. No. 82 at 12-14).

Here, the Court need not decide whether Cumpston's state law claim is preempted because he has not successfully established a claim for relief for retaliatory discharge in contravention of substantial public policy. To successfully present such a claim, West Virginia law requires Cumpston to "plead <u>and</u> prove the

following elements":

> 1. That a clear public policy existed and was
> manifested in a state or federal constitution,
> statute or administrative regulation, or in
> the common law (the clarity element).
>
> 2. That dismissing employees under
> circumstances like those involved in the
> plaintiff's dismissal would jeopardize the
> public policy (the jeopardy element).
>
> 3. The plaintiff's dismissal was motivated by
> conduct related to the public policy (the
> causation element).
>
> 4. The employer lacked overriding legitimate
> business justification for the dismissal (the
> overriding justification element).

Burke v. Wetzel Cty. Comm'n, 815 S.E.2d 520, 537 (W. Va. 2018)

(footnote omitted). "[A] Harless-based action requires more than

simply raising the spectrum of a potentially governing law." Id.

(quoting Frohnapfel v. ArcelorMittal USA LLC, 772 S.E.2d 350, 355

(W. Va. 2015)). "The mere citation of a statutory provision is not

sufficient to state a cause of action for retaliatory discharge

without a showing that the discharge violated the public policy

that the cited provision clearly mandates." Id. (quoting Swears v.

R.M. Roach & Sons, Inc., 696 S.E.2d 1, 7 (W. Va. 2010)).

Cumpston's allegations under Count Three of his complaint do

not even cite the FMLA or the WVHRA, let alone satisfy the four-

part test set forth in <u>Burke</u> (Dkt. No. 1-1 at 7-8). Moreover even if he had successfully pleaded his state law retaliation claim, it would fail because the defendants have provided a legitimate business justification for his termination. As discussed in detail in Section III.A, the defendants terminated Cumpston's employment because of an economic downtown in Central Supply's building supply business, and because he was the boom truck driver with the most safety-related incidents (Dkt. Nos. 80-3 at 6-8, 12, 80-4, 80-5, 80-6, 80-7, 80-8, 80-9, 80-10). Neither reason violates a substantial public policy. Therefore, the Court **GRANTS** the defendants' motion to dismiss Count Three of the Complaint.

**D.   West Virginia Wage Payment and Collection Act Claim**

In Count Four of the Complaint, Cumpston alleges that the defendants violated the West Virginia Wage Payment and Collection Act ("the WVWPCA") by failing to pay him wages for accumulated paid time off (Dkt. No. 1-1 at 8). The defendants argue that this claim must be dismissed because "Central Supply has an express, clear, written policy which states that unused vacation and sick time is forfeited upon separation of employment," which Cumpston understood as a term of his employment (Dkt. No. 81 at 22-23). Because Cumpston has not responded to this argument, the Court considers it

MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)

undisputed for purposes of summary judgment. See Fed. R. Civ. P. 56(e)(2).

Generally, the WVWPCA requires an employer to pay an employee's final wages, including any accrued or calculable fringe benefits, on or before the next regular payday on which the wages would otherwise be due and payable:

> Whenever a person, firm or corporation discharges an employee, or whenever an employee quits or resigns from employment, the person, firm or corporation shall pay the employee's wages due for work that the employee performed prior to the separation of employment on or before the next regular payday on which the wages would otherwise be due and payable: Provided, That fringe benefits, as defined in section one of this article, that are provided an employee pursuant to an agreement between the employee and employer and that are due, but pursuant to the terms of the agreement, are to be paid at a future date or upon additional conditions which are ascertainable are not subject to this subsection and are not payable on or before the next regular payday, but shall be paid according to the terms of the agreement.

W. Va. Code § 21-5-4(b). Fringe benefits "means any benefit provided an employee or group of employees by an employer, or which is required by law," including vacation and sick leave. W. Va. Code § 21-5-1(l). The Supreme Court of Appeals, however, has recognized that "the terms of employment may condition the vesting of a fringe

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

benefit right on eligibility requirements in addition to the performance of services, <u>and these terms may provide that unused fringe benefits will not be paid to employees upon separation from employment</u>." Syl. Pt. 5, <u>Meadows v. Wal-Mart Stores, Inc.</u>, 530 S.E.2d 676 (W. Va. 1999) (emphasis added).

Here, the terms of Cumpston's employment did just that. Central Supply's Employee Handbook explicitly states that "[i]n the event of severance of employment, either voluntary or involuntary, unused vacation time will be forfeited" (Dkt. No. 80-16 at 5). It also states that "[i]n the event of severance of employment, either voluntary or involuntary, unused sick time will be forfeited." <u>Id.</u> at 6. Because the terms of Cumpston's employment clearly state that unused vacation and sick time would be forfeited upon the severance of employment, his WVWPCA claim fails as a matter of law. Accordingly, the Court **GRANTS** the defendants' motion to dismiss Count Four of the Complaint.

**E.    Tort of Outrage Claim**

In Count Five of the Complaint, Cumpston pleads a tort of outrage, alleging that his wrongful termination was undertaken in an outrageous manner, resulting in the intentional infliction of emotional distress (Dkt. No. 1-1 at 9). The defendants argue that

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

Cumpston's own testimony establishes that his termination was anything but outrageous (Dkt. No. 81 at 25). Cumpston nevertheless insists that the defendants' conduct was outrageous because he was "devastated" and Central Supply ignored his multiple attempts to contact HR after he was terminated (Dkt. No. 82 at 15).

Under West Virginia law, to establish the tort of outrage, which is also known as intentional infliction of emotional distress, Cumpston must establish the following four elements:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. Pt. 3, <u>Travis v. Alcon Labs.</u>, 504 S.E.2d 419 (W. Va. 1998). In other words, the defendants' conduct must have "been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Id.</u> at 425 (quotation omitted). In the employment context, "when the

27

employee's distress results from the fact of his discharge-e.g., the embarrassment and financial loss stemming from the plaintiff's firing-rather than from any improper conduct on the part of the employer in effecting the discharge, then no claim for intentional infliction of emotional distress can attach." Syl. Pt. 2, <u>Dzinglski v. Weirton Steel Corp.</u>, 445 S.E.2d 219 (W. Va. 1994).

Here, the evidence falls woefully short of satisfying the four-part test in <u>Travis</u>. In his deposition, Cumpston testified that he was terminated during a face-to-face meeting with Nuzum, during which she first informed him that he was being terminated because Central Supply was downsizing, and then offered him a severance package (Dkt. No. 80-1 at 31-33). Cumpston acknowledged that Nuzum did not raise her voice, scream, or yell at him when discussing his termination, nor did she use any profanity or inappropriate language. <u>Id.</u> at 32-33. Indeed, he testified that she acted in a completely professional manner. <u>Id.</u> Despite this, Cumpston claims he was "devastated" by his termination and felt like a criminal when he was escorted from the premises by Nuzum following the meeting. <u>Id.</u> at 33.

Simply put, even if hurtful, none of this conduct was "so outrageous in character, and so extreme in degree, as to go beyond

all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Travis</u>, 504 S.E.2d at 425. Although Cumpston was distressed, that distress was——by his own admission——not the result of Nuzum's conduct (Dkt. No. 80-1 at 31-33). Because the evidence falls far short of satisfying the four-part test set forth in <u>Travis</u>, Cumpston's claim of tort of outrage fails as a matter of law. Therefore, the Court **GRANTS** the defendants' motion and **DISMISSES** Count Five of the Complaint.

## F.    Short Term Disability Insurance Retaliation Claim

In Count Six of the Complaint, Cumpston alleges a claim of short-term disability insurance retaliation (Dkt. No. 1-1 at 9). He now seeks to voluntarily dismiss Count Six (Dkt. No. 79). Under the Federal Rules of Civil Procedure, after the defendant has served an answer, a claim or cause of action "may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). After considering Cumpston's motion, and finding good cause, the Court **GRANTS** the motion (Dkt. No. 79) and **DISMISSES** Count Six of the Complaint.

## IV. CONCLUSION

For all the reasons discussed, the Court:

29

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 80), AND
GRANTING PLAINTIFF's MOTION TO DISMISS COUNT SIX (DKT. NO. 79)**

(1) **GRANTS** Cumpston's motion to dismiss Count Six of the Complaint (Dkt. No. 79) and **DISMISSES** Count Six **WITH PREJUDICE**; and

(2) **GRANTS** the defendants' motion for summary judgment (Dkt. No. 80) and **DISMISSES** the Complaint **WITH PREJUDICE**.

It is so **ORDERED**.

The Court **DIRECTS** the Clerk to transmit copies of this Order to counsel of record and enter a separate judgment order in favor of the defendants Central Supply Company of West Virginia and Patrick Scott Tucker.

DATED: October 5, 2018.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE